UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 21/22/2018

PHILLIP HENRY,

                    Plaintiff,

        - against -

MORGAN'S HOTEL GROUP, INC.,

                    Defendant.

**OPINION AND ORDER**

15 Civ. 1789 (ER)

Ramos, D.J.:

On October 27, 2016, Defendant Morgan's Hotel Group, Inc. ("Morgan's Hotel" or "Defendant") filed a motion for sanctions against Plaintiff Phillip Henry ("Henry" or "Plaintiff") pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. Doc. 91. In a conference on September 12, 2017, the Court granted in part and denied in part Defendant's motion. Doc. 103. On September 26, 2017, Defendant moved for reconsideration of the Court's decision not to sanction Plaintiff with respect to his failure to produce his mental health records. Doc. 107.

For the following reasons, Defendant's motion for reconsideration is GRANTED and Defendant's motion for sanctions is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

Henry initiated this lawsuit by filing the Complaint on March 10, 2015. On October 28 of that year, Defendant served its first set of interrogatories and requests for production. Interrogatory Twelve asked Henry to:

> Identify all health care providers from whom you have sought or obtained a diagnosis or treatment or whom you have consulted in any way in the past ten years and the date and reason for such treatment.

*See* Affirmation of Francis Cook in Support of Defendant's Motion for Sanctions ("Cook Aff.")

(Doc. 93), Ex. B at 9. Henry objected to this interrogatory and did not provide a response. *Id.*

His response was signed by one of his attorneys, Chloe Liederman ("Liederman"). Defendant

also requested that Henry produce:

> 15. All documents that refer or related in any way to any illnesses,
> disabilities or conditions (mental or physical) from which Plaintiff
> suffered or suffers at any time within the last ten years, including,
> but not limited to, all medical and psychiatric records concerning
> Plaintiff.

> 16. All documents that refer or relate to any medications taken by
> or prescribed to Plaintiff within the last five years.

> 17. All documents that refer to or relate in any manner to damages
> allegedly suffered by Plaintiff in this action.

*See id.* Ex. C at 7. Henry similarly objected to these requests for production and stated that he

would produce responsive documents "upon execution of a confidentiality agreement and

stipulation governing the use and scope of such documents." *Id.* Hen ry's response was signed

by Liederman. The parties signed a confidentiality agreement and protective order on February

29, 2016. *Id.* Ex. E. On March 11, 2016, Defendant's counsel, Francis Cook ("Cook"), wrote to

Henry's counsel, Gail Auster ("Auster") to seek outstanding discovery responses. Referring to

the outstanding requests for medical records and damages, Cook stated that "[n]ow that the

confidentiality agreement has been entered, there is no reason why these documents remain

outstanding. Please provide them immediately." *Id.* Ex. F.

At a status conference held on July 20, 2016, Defendant's attorney Jonathan Ash ("Ash")

raised the issue of the unproduced medical records. Doc. 79 (July 20, 2016 Conference

Transcript) at 15:9–23. Auster responded that Plaintiff was seeking responsive documents and

would produce them. *Id.* at 15:25–16:1. The Court asked specifically whether there were

documents "reflecting medical treatment that [Henry] sought and received." *Id.* at 16:2–4.

Auster indicated that there were and said that Plaintiff was "depending upon third parties" for the

documents. *Id.* at 16:7–8. On Friday, July 29, 2016, in response to an email from Ash inquiring

about the production of medical records, Leiderman explained that they had sent Henry's HIPAA

authorization to his mental health provider, Dr. Richard Bennett, that day. Cook Aff. Ex. J.

On August 2, 2016, Auster received a voice mail from Dr. Bennett confirming that

Plaintiff had consulted him in December 2014. *See* Affirmation of Gail I. Auster in Opposition

to Defendant's Motion for Sanctions ("Auster Aff.") (Doc. 94) ¶ 2.[1] Auster retained a copy of

the voice mail on her cell phone. *Id.* On August 3, 2016, Auster called Dr. Bennett and asked

him to locate his notes from his interaction with Henry. *Id.* ¶ 3. On August 17, 2016, Auster

called Dr. Bennett again and learned that he still had not located any notes. *See* Third

Affirmation of Gail I. Auster in Further Opposition to Defendant's Motion for Reconsideration

("Auster Third Recons. Aff.") (Doc. 132) ¶ 6. She asked him to send a letter or email stating that

he could not locate the notes of the meeting. *Id.* Dr. Bennett sent Auster an email on September

7, 2016, explaining that he could not find any notes from his single session with Plaintiff due to a

technical error at the time of treatment. *Id.* Ex. 2.[2] Dr. Bennett's email, contrary to the voice

---

[1] The voice mail stated: "Miss Auster, this is Dr. Bennett. Please do not return the call to the phone number you see on your phone; I cannot receive messages very well. I will call you from my home office telephone tomorrow. But let me say in the meantime, that the individual you wrote to me about I saw only once, in December 2014. Regrettably I have not been able to find notes yet, notes on that encounter. I was changing over to an electronic system at that point so, um, but in any event if he had come to me and revealed at that point that he had litigation, I am not a forensic psychologist and would have turned him away. But he never became a patient. And even if I could find the notes on the one encounter, that was not a complete evaluation in any event. Nonetheless, just giving you this advance information, I will try to reach you tomorrow or if this suffices, please let me know." Third Affirmation of Gail I. Auster in Further Opposition to Defendant's Motion for Reconsideration ("Auster Third Recons. Aff.") (Doc. 132), ¶ 4.

[2] Dr. Bennett's email states: "My records indicate that I saw Phillip Henry on 12/04/2015. He was assigned a follow-up appointment on 12/11/2015 but did not show for that appointment. No further appointments were offered. Regrettably, after a thorough search, I have been unable to find any notes from the 12/04/2015 encounter. This office carefully keeps and stores patient records, but an error must have occurred in the case of Mr. Henry. We were

mail he left for Auster, states that he met with Henry in December 2015 as opposed to December 2014. *Id.* Ms. Auster did not pick up on this important discrepancy.

Having heard nothing from Plaintiff's counsel in this time period, Cook emailed Auster about the medical records again on September 8, 2016. Cook Aff. Ex. K. That day, on a telephone call, Auster informed Cook that Plaintiff's medical records had been destroyed. *Id.* Ex. L.

On October 27, 2016, Defendant moved for sanctions based on a variety of discovery issues, including Plaintiff's failure to timely request and produce medical records. *See* Doc. 91. On September 12, 2017, the Court held oral argument regarding Defendant's sanctions motion. There, Liederman affirmed, mistakenly, that the date of Henry's consultation with Dr. Bennett was December 4, 2015, and that the notes of that visit were destroyed contemporaneously. Doc. 103 (September 12, 2016 Conference Transcript) at 10:5–14. Liederman emphasized that this visit occurred *after* Defendant filed its first requests for production and set of interrogatories. *Id.* 17:4–8.

The Court denied Defendant's motion for sanctions, finding, with respect to the medical records, that:

> The determination of an appropriate sanction for spoliation is confined to the sound discretion of the court. Citing *Metropolitan Opera Association, Inc. v. Local 100*, reported at 212 F.R.D. 178. For the court to impose sanctions based on spoliation, the movant "must establish (1) that the party having control over the evidence had an obligation to [preserve] it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. Citing *Residential Funding Corp. v. DeGeorge Financial Corp.*, reported at 306 F.3d 99.

---

changing to an electronic record system at that time that required transcribing. I am sorry that I cannot be more helpful." *Id.*

As to the medical records, the Court holds that the third prong of the spoliation analysis poses a hurdle for Defendant because it is not shown that the destroyed evidence was relevant. I note also that the second prong that the records were destroyed with a culpable state of mind also . . . presents an obstacle for the defense, because if I take the doctor at his word, obviously he did not intend purposely to destroy these documents. The term "relevant" in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Instead, to establish relevance, the party seeking sanctions must adduce sufficient evidence from which a reasonable trier of fact could infer [that] the destroyed evidence would have been "favorable to its case." The state of mind with which the evidence was destroyed affects what showing is required of the movant: Where the destruction was the result of mere negligence, a presumption of relevance never applies. Citing *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, reported at 282 F.R.D. 346.

Here, as it relates to the medical records, the current record before the Court suggests that Plaintiff's conduct in not informing the doctor to retain the records was not even negligent, as opposed to willful or grossly negligent. Therefore, a presumption of relevance is inappropriate. Thus, under the negligence standard for sanctions to be warranted, there must be extrinsic evidence to demonstrate that the destroyed evidence would have been unfavorable to the destroying party. Citing *Great North Insurance Co. v. Power Cooling, Inc.*, reported at 2007 WL 2687666, at *11. Defendant fails to meet that standard and provides no evidence to suggest that the medical records would have been favorable to it.

*Id.* 17:12–19:5. The Court also ordered Plaintiff to produce documents relating to two separate discovery disputes, concerning an alleged emotional distress journal maintained by Henry and text messages between Henry and his co-workers about their employment. *Id.* 20:16–25.

The Court gave Plaintiff a deadline of September 25, 2017 by which to comply with the Order. *Id.* On that date, Liederman contacted Defendant to request a two-day extension, which Defendant assented to. *See* Doc. 110; Doc. 124 (October 25, 2017 Conference Transcript) at 2:9–22. On September 27, 2017, Liederman sent Defendant Plaintiff's most recent responses to Defendant's request for admission, but did not provide any of the materials the Court discussed

in the September 12, 2017 Order. *Id.* On October 10, 2017, Henry provided a sworn statement to Defendant explaining that he did not keep an emotional distress journal and could not find any responsive text messages with co-workers, but had discovered a few responsive text messages from his conversations with his former boyfriend, Michael Homan-Grey ("Homan-Grey"). Doc. 124 (October 25, 2017 Conference Transcript) at 3:1–19; *see also* Reply Affirmation of Francis V. Cook in Support of Defendant's Motion for Reconsideration ("Cook Reply Aff.") (Doc. 120) Ex A. In one text message chain, dated January 23, 2015, Henry said, "this week was hell, new therapist." *Id.* at HENRY0255. Homan-Grey responded, "Did you at least like the new therapist?." *Id.* Henry replied, "Meh, seems okay. I hadn't seen anyone for weeks because well I couldn't even afford that." *Id.* at HENRY0256. In another undated text message, Henry asked Homan-Grey if he could borrow $60 for a co-pay for a therapy session. *Id.* at HENRY0260.

On September 26, 2017, before Plaintiff produced these text messages, Defendant moved for reconsideration of the Court's ruling on sanctions with respect to the medical records (Doc. 107). Despite the recently produced evidence suggesting that Henry visited a therapist in early 2015, Plaintiff's counsel filed an opposition to Defendant's motion for reconsideration on October 12, 2017, in which they reiterated that Henry's only mental health treatment was "a single, hour-long consultation" with Dr. Bennett on December 4, 2015. *See* Memorandum of Law in Opposition to Defendant's Motion for Reconsideration ("Recons. Opp. Mem.") (Doc. 113) at 1.

Defendant raised this issue in its reply brief in support of reconsideration and again at a conference held on October 25, 2017. *See* Reply Memorandum of Law in Support of Defendant's Motion for Reconsideration ("Recons. Reply Mem.") (Doc. 119), at 6–7; Doc. 124

(October 25, 2017 Conference Transcript) at 3:20–4:4.  At that October 25, 2017 conference,

Auster was asked about Henry's mental health treatment.  She informed this Court:

> As to any issue of his having seen a therapist for a year before that,
> I don't know anything about that.  I don't know where they would
> have even deemed that to be true from the text messages.  In our
> communications with our client—I don't want to violate attorney-
> client privilege—we believe that there was one encounter with one
> therapist.

Doc. 124 (October 25, 2017 Conference Transcript) at 7:2–8.  The Court ordered a supplemental

round of briefing on Defendant's reconsideration motion to allow the parties to fully explain

their positions.  In further briefing, Plaintiff's counsel stated that they had "made no

misstatement to the Court about the extent of [Plaintiff's] treatment."  *See* Memorandum of Law

in Further Opposition to Defendant's Motion for Reconsideration ("Further Opp. Mem.") (Doc.

130), at 3.  Plaintiff's counsel argued that Henry's text messages, speaking of a "new therapist"

to Homan-Grey in January 2015, were referencing Dr. Bennett, with whom Henry met once.  *Id.*

at 2.  Plaintiff's counsel did not explain why, if they believed the mental health visit took place in

December 2015, Henry was discussing a "new therapist" in January 2015.

 The dispute between the parties over the accuracy of Plaintiff's representations regarding

his mental health treatment came to a head on November 30, 2017, at Henry's second deposition.

There, Ash questioned Henry about his text messages with Homan-Grey.  Henry responded:

> Well, first, I'd like to correct my testimony earlier and say that Dr.
> Bennett is wrong in his e-mail . . . about the date that I saw him and
> that these text messages help me recall that, and that I saw him in
> 2014 and he is incorrect.  So that I just want to correct.  These text
> messages help me remember that.
>
> I did not actually see a new therapist.  What I was referring to here
> was the fact that having seen Dr. Bennett and not feeling
> comfortable with him, I wanted to see a new therapist, so I spoke to
> a new therapist on the phone for a short conversation in which I

> basically interviewed the therapist to see what kind of, like, style
> and person and what they did for requests.

Affirmation of Jonathan Ash in Further Support of Defendant's Motion for Reconsideration ("Ash Aff.") (Doc. 133) Ex. A ("Henry Dep.") at 331:16–332:7. Henry's sworn testimony thus revealed that he spoke with two therapists: Dr. Bennett, in December 2014, and another therapist in January 2015.

The next day, Ash called Dr. Bennett's office for the purpose of confirming Plaintiff's treatment date. Ash Aff. ¶ 4. Ash spoke with Dr. Bennett's wife and business partner, Dr. Janice Bennett. *Id.* ¶ 5. She informed Ash that Dr. Bennett passed away in April 2017. *Id.* Dr. Janice Bennett also confirmed that Dr. Bennett met Henry on December 4, 2014, and had recorded a provisional DSM diagnosis of adjustment disorder with mixed disturbance of emotions and conduct. *Id.* ¶¶ 7–8; *see also* Auster Third Recons. Aff. Ex. 5.

On December 7, 2017, the parties came before the Court for a conference. At that conference, for the first time, Liederman confirmed to the Court that the text messages refer to a second mental health provider, although Henry "did not subsequently end up meeting with" that provider. Doc. 134 (December 7, 2017 Conference Transcript) at 3:13–21. Liederman also confirmed that the consultation with Dr. Bennett actually occurred in December 2014, but that she "had no advance warning" and learned about the date when Defendant did, at Plaintiff's deposition the previous week. *Id.* at 17:18–25. Auster clarified that when she spoke with Henry regarding his mental health treatment, he "was fuzzy on the dates, and he couldn't remember 2014, 2015." *Id.* at 36:18–21. However, Auster stated that when she received the email from Dr. Bennett listing the treatment year as 2015, she trusted that date because, in her opinion, "if the therapist tells me that this is the date, I would put more credibility into that than anybody else's recollection, because they have to keep records." *Id.* at 17:1–3.

Speaking for Defendant, Ash argued that Plaintiff's counsel violated their duty to make reasonable inquiries in response to discovery demands by failing to correctly ascertain the date of the visit to Dr. Bennett, when they were putting together responses to Defendant's first set of interrogatories in December 2015. At that point, he argued, it should have been clear to Henry, had he been asked by counsel, that the visit to Dr. Bennett occurred one year prior, in December 2014, and not that same month. *Id.* at 4:20–6:3. He also emphasized that he was easily able to ascertain the date of Henry's visit to Dr. Bennett and his provisional diagnosis by simply calling Dr. Bennett's practice. *Id.* at 9:7–19. Ash explained to the Court his understanding that Henry's provisional diagnosis was "consistent" with other emotional stressors in his life, and argued that Henry was contacting other physicians in January 2015 in order to "shop around for a potentially better diagnosis that might help in this case." *Id.* at 9:20–10:11. Ash also raised a separate issue regarding Plaintiff's production of text messages, because his understanding based on Henry's deposition was that "in October of 2015, when [Defendant] initially requested text messages, Plaintiff really conducted no kind of thorough search for those text messages at all." *Id.* at 30:2–6. Ash also argued that Plaintiff's failure to consult Defendant about forensic imaging of Henry's broken iPhones was "not really excusable." *Id.* at 34:9.

Subsequently, Auster filed an additional affirmation further explaining Henry's mental health treatment. Auster stated that she "did not pick up the difference in the year of the encounter between the voice mail and the email" and that she did not realize she had retained Dr. Bennett's voice mail until December 10, 2017. Auster Third Recons. Aff. ¶ 9. Auster had also

spoken with Dr. Janice Bennett, who confirmed Plaintiff's consultation date and provisional diagnosis. *Id.* ¶ 22.[3]

Ash also filed an additional affirmation, further explaining his interaction with Dr. Janice Bennett, as discussed above. Ash also stated that he believed this Court was treating him with a "double standard" because Plaintiff's counsel's "seemingly act[ed] with impunity in . . . maligning me in an unsolicited submission to the Court," while he "was admonished by the Court for arguing that Plaintiff's counsel acted in bad faith." Ash Aff. ¶¶ 14–16.[4]

## II.  MOTION FOR RECONSIDERATION

### A.  Legal Standard

Rule 6.3 of this District's Local Civil Rules provides for reconsideration of a court order only where the moving party "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error of manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (internal quotations omitted). The basis upon which reconsideration is sought—new evidence, overlooked evidence, or overlooked controlling authority—must be significant enough that had it been considered, it "might have reasonably altered the result before the court." *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) (quoting *Greenwald v. Orb Commc'ns & Mktg., Inc.*, No. 00 Civ. 1989 (LTS), 2003 WL 660844, at *1 (S.D.N.Y. Feb. 27, 2003)).

Local Rule 6.3 is "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Mikol*, 554 F. Supp. 2d at

---

[3] Auster added that in her view, Dr. Janice Bennett "inadvertently committed a manifest violation of HIPAA by sharing Plaintiff's health information with Mr. Ash" and that the latter "willfully and wrongfully solicited Mr. Henry's health related information." *Id.* ¶¶ 28–29.

[4] In fact, the Court simply informed Ash that describing Plaintiff's assertions of the treatment date as "mistaken" rather than "false" would be more accurate. *See* Doc. 134 (December 7, 2017 Conference Transcript) at 8:6–17. In addition, the Court told Ash that it understood his frustration. *Id.* at 27:21.

500 (quoting *Dellefave v. Access Temps., Inc.*, No. 99 Civ. 6098 (RWS), 2001 WL 286771, at *1 (S.D.N.Y. Mar. 22, 2001)). "Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied." *Id.* (citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

A motion for reconsideration is not a vehicle for a party dissatisfied with the Court's ruling to voice its disagreement with the decision. *R.F.M.A.S., Inc. v. Mimi So*, 640 F. Supp. 2d 506, 512 (S.D.N.Y. 2009). Indeed, "[r]econsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).

**B.  Discussion**

Defendant primarily puts forward two bases for reconsideration. First, Defendant argues that the Court overlooked the standard for an adverse inference instruction set forth in *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346 (S.D.N.Y. 2012), *aff'd* No. 11 Civ. 1299 (HB), 2012 WL 1849101 (S.D.N.Y. May 21, 2012). *See* Memorandum of Law in Support of Defendant's Motion for Reconsideration ("Recons. Mem.") (Doc. 107-1). Second, Defendant argues that new evidence that has been revealed since the original motion for sanctions—namely, Henry's testimony through contemporaneous text messages and his November 2017 deposition—shows Plaintiff's "disregard" for discovery obligations and "lack of candor" towards this Court. *See* Recons. Reply Mem. at 1.

### 1. Appropriate Standard for Adverse Inference Instruction

In denying Defendant's motion for an adverse inference, the Court noted that Defendant had not met its burden with respect to the second element of the adverse inference analysis, which looks at a party's culpability, because "if [the Court] take[s] the doctor at his word, obviously, he did not intend purposely to destroy these documents." Doc. 103 (September 12, 2017 Conference Transcript) at 18:5–6. However, in determining the appropriateness of sanctions, the question before the court is whether the party against whom sanctions is sought acted culpably. *See GenOn*, 282 F.R.D. at 356 ("The next question the Court must consider is whether GenOn acted with a culpable state of mind, *i.e.*, at least negligently, by failing to cause FTI to preserve its information."). The Court agrees with Defendant that during the September 12, 2017 hearing it incorrectly applied the second element of the adverse inference analysis.

In order to grant reconsideration, the overlooked authority must be significant enough to have the potential to alter the result before the court. *See Mikol*, 554 F. Supp. 2d at 500. Here, the Plaintiff's level of culpability determines the standard the Court applies to the third prong of the adverse inference analysis: if Plaintiff was not negligent, the Court need not reach the third element (the relevance of the unproduced information) at all; if Plaintiff was grossly negligent, Defendant is entitled to a rebuttable presumption that the missing evidence would have been favorable to it; and if Plaintiff was ordinarily negligent, no presumption applies. *GenOn*, 282 F.R.D. at 358 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) and *Zaubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003)). Because a more thorough determination of the second element of the adverse inference analysis could have altered its conclusion about the relevance of the missing medical records, the Court finds that reconsideration is appropriate.

## 2.     Newly Discovered Evidence

Further, Defendant points to two important pieces of evidence with regard to medical records that were not available during its initial motion for sanctions—or even its opening brief in support of reconsideration. First, Plaintiff's medical visit with Dr. Bennett was in December 2014 rather than December 2015. *See* Henry Dep. at 331:16–332:7. Second, Plaintiff subsequently spoke with a different therapist, although their brief conversation focused on the therapist's qualifications and methodology rather than Plaintiff's mental health. *Id.*

When newly-discovered evidence is the basis of a motion for reconsideration, the moving party must show that: "(1) the proffered evidence was unavailable despite the exercise of due diligence by the movant in procuring evidentiary support, and (2) manifest injustice will result if the court opts not to reconsider its earlier decision." *In re Rezulin Products Liability Litig.*, 224 F.R.D. 346, 350 (S.D.N.Y. 2004). Defendant easily meets these requirements. Defendant has diligently sought as much information as possible regarding Plaintiff's mental health visit(s) since October 2015, and the fact that Plaintiff incorrectly represented the timing and number of therapists Henry spoke to is plainly relevant to Defendant's sanctions motion. The Court will therefore GRANT Defendant's motion for reconsideration, and will weigh this newly discovered evidence when determining whether sanctions are appropriate.

## III.     MOTION FOR SANCTIONS

Although Defendant originally sought only spoliation sanctions under Rule 37(c), Morgan's Hotel now also seeks sanctions under Rule 26(g), Rule 37(b), 28 U.S.C. § 1927, and the Court's inherent power.

## A. Appropriateness of an Adverse Inference Instruction

### 1. Legal Standard

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(b)(2) provides for the possibility of sanctions where a party or party's representative "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2). Rule 37 is "intended to encourage and enforce strict adherence to the 'responsibilities counsel owe to the Court and to their opponents . . . .'" *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976)). A court has "broad discretion in fashioning an appropriate sanction" under Rule 37. *See Residential Funding Corp.*, 306 F.3d at 107. However, before the Court may issue an adverse inference on the basis of unavailable evidence, the moving party must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind;' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.* (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir. 2001)). In exercising its discretion under Rule 37, a court should consider "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been

warned of the consequences of noncompliance." *S.E.C. v. Setteducate*, 419 F. App'x 23, 24 (2d

Cir. 2011) (quoting *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)).

## 2. Discussion

As discussed above, Defendant seeks sanctions pursuant to Rule 37(c) for Plaintiff's

failure to produce records of Henry's mental health treatment. In denying Rule 37 sanctions

initially, the Court took issue with the second and third elements of the adverse inference

analysis.[5] The second element of the adverse inference analysis requires the Court to determine

the non-moving party's level of culpability. Here, there is no evidence that Plaintiff intended for

the medical records to be destroyed, and Plaintiff's counsel believed that Dr. Bennett would

preserve the medical records because he was under a professional obligation to do so. *See*

Recons. Opp. Mem. at 8–9. However, as summarized below, Plaintiff's conduct over the last

three years shows that they were not entirely diligent in their efforts to uncover the medical

records.

- October 2014: Henry files a complaint with the Equal Employment Opportunity Commission ("EEOC"). *See* Doc. 134 (December 12, 2017 Conference Transcript) at 10:15–16.

- December 4, 2014: Henry attends a single consultation with Dr. Bennett, seeking therapy because he felt "very stressed out" about his workplace environment. *See* Auster Third Recons. Aff. Ex. 5; Henry Dep. at 307:15–308:2.

- March 10, 2015: Henry files the instant lawsuit. *See* Doc. 1.

- October 28, 2015: During discovery, Defendant requests the identity of all health care providers Plaintiff consulted with and any medical records from those visits. *See* Cook Aff. Ex. C.

---

[5] Plaintiff does not contest the first element, control over the requested documents. Indeed, the concept of "control" is construed broadly and requires only that the party from whom the documents are requested has the "right, authority, or practical ability to obtain the documents from a non-party to the action." *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (quoting *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146–47 (S.D.N.Y. 1997)).

- December 18, 2015: Plaintiff states that it will produce medical records and respond to Defendant's interrogatories upon the execution of a confidentiality agreement. *Id.*

- February 29, 2016: The confidentiality agreement is executed. *Id.* Ex. E.

- March 11, 2016: Defendant inquires about the status of the medical records. *Id.* Ex. F.

- July 20, 2016: Defendant inquires again about the production of medical records at a conference held before the Court. *See* Doc. 79 (July 20, 2016 Conference Transcript) at 15:9–23.

- July 29, 2016: Defendant asks about the production of medical records for a third time. Cook. Aff. Ex. J. That day, Plaintiff sends a HIPAA authorization to Dr. Bennett for the first time, which would authorize the release of any medical records to Plaintiff's counsel. *Id.* This appears to be Plaintiff's first outreach to Dr. Bennett. Auster Third Recons Aff. ¶ 2; *id.* Ex. 1.

- At some point thereafter, Dr. Bennett calls Auster to say that he was traveling but would call her on his return to New York. *Id.* ¶ 3.

- August 2, 2016: Dr. Bennett leaves a voice mail for Auster, stating that he had not yet been able to find notes from Henry's consultation and stated that he had been "changing over to an electronic system" at the time of the consultation. *Id.* ¶ 4.

- August 3, 2016: Dr. Bennett speaks with Auster again and repeated that his office had been transitioning to an electronic recordkeeping system and that he could not locate the notes. *Id.* ¶ 5.

- August 17, 2016: Auster speaks with Dr. Bennett again, who informs her that he could not locate the treatment notes. Auster asks Dr. Bennett to create a letter in writing explaining that the treatment notes were lost. *Id.* ¶ 6.

- September 7, 2016: Dr. Bennett provides an email, twice misstating the treatment date as December 4, 2015 and explaining that he could not locate written notes from his consultation with Henry. *Id.* Ex. 2.

- September 8, 2016: Defendant inquires again about the status of the medical records. Cook Aff. Ex. K. Auster speaks with Cook by telephone and informs him that the medical records were unavailable. *Id.* Ex. L.

Defendant argues that Plaintiff's actions constitute gross negligence because the failure to issue a litigation hold can (although does not necessarily) constitute gross negligence. Recons. Mem. at 8–9; *see also Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). Defendant points to *Sekisui American Corporation v. Hart*, in which the court determined that a plaintiff's failure to issue a litigation hold for fifteen months after the notice of claim was filed, and did not notify its IT vendor of the duty to preserve until six months later, constituted gross negligence. Recons. Mem. at 8–9; *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013).

Here, Plaintiff filed a complaint with the EEOC in October 2014. *See* Doc. 134 (December 12, 2017 Conference Transcript) at 10:15–16. However, as the above timeline reveals, Plaintiff made no apparent effort to preserve or produce Henry's medical records until approximately July 29, 2016, which was twenty-one months after filing the EEOC charge, fifteen months after filing the Complaint, and nine months after Defendant requested medical records.[6] It was only then that Plaintiff reached out to Dr. Bennett and learned that the treatment notes had been inadvertently destroyed.[7] Given Dr. Bennett's unequivocal, first-person reports in both his

---

[6] In her affirmation, Auster points out that the HIPAA authorization was dated July 7, 2016. Auster Third Recons. Aff. ¶ 2. However, the authorization is also dated July 29, 2016, and Plaintiff's contemporaneous emails show that the authorization was not sent to Dr. Bennett's office until that day. *See id.* Ex. 1; Cook Aff. Ex. J.

[7] It is unclear when, exactly, the treatment notes were destroyed. Dr. Bennett explained in his 2016 email to Auster that the notes were destroyed because "[w]e were changing to an electronic record system *at that time* that required transcribing." Auster Third Recons. Aff. Ex. 2 (emphasis added); *see also id.* ¶ 4 ("But let me say in the meantime, that the individual you wrote to me about I saw only once, in December 2014. Regrettably I have not been able to find notes yet, notes on that encounter. I was changing over to an electronic system at that point so . . . ."). Because that email (incorrectly) stated that Henry's visit occurred in 2015, Defendant has suggested that the treatment notes were not destroyed until December 2015. *See* Doc. 134 (December 12, 2017 Conference Transcript) at 12:14–13:4. Although Defendant argues that Dr. Bennett was incorrect about the date of Henry's consultation but somehow correct about the time period in which the records were destroyed, the Court finds that Dr. Bennett's email is more plausibly read as stating that the records were destroyed contemporaneously to Henry's mental health visit, especially when read in conjunction with the transcription of the voice mail, which included the correct treatment date and explained that the notes were destroyed "at that point."

voice mail and email that no documentation of the consultation survived, Auster's conclusion that the information was irretrievably lost was not unreasonable. However, as became apparent when Defendant called Dr. Bennett's office in late 2017, a limited record of Henry's visit *did* exist, and included the correct date of Henry's consultation as well as his provisional diagnosis. *See* Auster Third Recons. Aff. Ex. 5. Had Auster more diligently followed up with Dr. Bennett, it is possible that she may have learned this information over a year before Defendant discovered it. Counsel's failure to proceed more diligently to obtain the relevant documents and willingness to rely solely on the belief that Dr. Bennett would maintain them, without any effort to ensure that those records were preserved, amounts to gross negligence. *See Sekisui Am. Corp.*, 945 F. Supp. 2d at 507.

Defendant also argues that Plaintiff's conduct is so "outrageous" that it "easily rises to the level of bad faith required to impose the harshest of sanctions." Reply Recons. Mem. at 7. Specifically, Defendant points to three of Plaintiff's failures: (1) Plaintiff's failure to inform Dr. Bennett that his visit was made in connection with ongoing litigation; (2) Counsel's reference to medical records in discovery responses without disclosing Dr. Bennett's name, preventing Defendant from deposing him or seeking records from him;[8] and (3) Counsel's insistence during the July 2016 conference that its production of medical records was "depending on third parties" when, in fact, Counsel had not yet requested that information. Recons. Mem. at 5–6.

In the context of Rule 37(c), a court must find that a party's actions evinced "an intent to obstruct the opposing party's case," in order to find that the party acted in bad faith. *See Byrnie*

---

[8] Defendant does not provide a citation to the document(s) in which Plaintiff allegedly refers to its intent to use medical records without disclosing Dr. Bennett's name. Regardless, Defendant learned Dr. Bennett's name on September 8, 2016. *See* Memorandum of Law in Support of Defendant's Motion for Sanctions (Doc. 92), at 19. Defendant could have sought to reopen discovery to seek more information from Dr. Bennett at that time, but did not do so.

*v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001) (explaining bad faith in the context of an adverse instruction). Discussing a similar sanctions provision, the Second Circuit has determined that a court may find bad faith where a party's actions were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Metro. Opera*, 212 F.R.D. at 220 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)). In *Metropolitan Opera*, the court's bad faith finding rested on a party's violation of several court orders, contradictory statements regarding the existence of certain evidence, and intentional misrepresentations about a deponent's availability. *See De Espana v. Am. Bureau of Shipping*, No. 03 Civ. 3573 (LTS) (RLE), 2007 WL 1686327, at *4 (S.D.N.Y. June 6, 2007) (summarizing the relevant conduct in *Metropolitan Opera*). Here, the Court does not find evidence of actions so egregious that it must impute an improper motive to them. Rather than trusting a voicemail Dr. Bennett left when he was out of the country, Plaintiff followed up with him, requested that he document his representation that he could not locate any relevant documents, and then relied on Dr. Bennett's written message that he had met with Henry in December 2015 and that all treatment records were lost. *See* Auster Third Recons. Aff. Ex. 2. Although, as discussed above, Plaintiff's counsel should have been more diligent in seeking and confirming this information, the Court cannot determine that counsel acted "completely without merit" or with "an intent to obstruct" Defendant's case. Similarly, although Plaintiff offered no defense for its statement that production was dependent on third parties when Plaintiff had not yet taken steps to secure the medical records, the Court cannot find that this conduct evinces an intent to obstruct. Therefore, the Court does not find that Plaintiff's culpability rises to the level of bad faith.

Having found that Plaintiff's counsel acted with gross negligence, there is a rebuttable presumption that the lost treatment notes were relevant to Defendant's claims. *GenOn*, 282 F.R.D. at 357–58 ("[I]f GenOn's failure to preserve FTI's electronically-stored information rises to the level of gross negligence, Shaw would be entitled to a rebuttable presumption that any missing evidence would have been favorable to Shaw."). Defendant argues that Plaintiff cannot rebut the presumption of relevance because of evidence supporting the relevance of the medical treatment notes for Defendant's claims. Defendant points to the fact that, at the time of the mental health consultation, Homan-Grey and Henry had recently broken up. *See* Recons. Mem. at 10. Additionally, Defendant argues that a series of tweets written by Henry in 2017 which discuss his early financial struggles in New York, his estrangement from his family for several years, and his difficult process of coming out as gay show that Henry's main emotional stressors were not connected to his employment with Defendant.[9] *See* Recons. Reply Mem. at 5.

Plaintiff does not present evidence showing that Henry did not discuss these issues with Dr. Bennett. Instead, Plaintiff argues that an adverse inference instruction is inappropriate where, as here, Dr. Bennett indicated that he contemporaneously and unintentionally deleted the treatment notes. *See* Recons. Opp. Mem. at 1.

The Second Circuit has emphasized that "a finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction." *Chin*, 685 F.3d at 162. A court may properly reject an adverse inference instruction "in light of the limited role" of the missing documents. *Id.* Plaintiff argues that the existence of medical records is not

---

[9] Defendant's counsel has also argued that these other extrinsic factors, not the alleged discrimination Henry faced, caused Henry to visit Dr. Bennett and informed Dr. Bennett's diagnosis. *See* Doc. 134 (December 12, 2017 Conference Transcript) at 9:16–10:11). Since there are no treatment notes available, it is not clear how Defendant's counsel reached this conclusion. In any event, that is a conclusion the Court cannot make on this record and in the absence of expert testimony.

dispositive, or even significant, because plaintiffs in the Second Circuit may seek "garden variety" emotional distress damages. *See* Memorandum of Law in Opposition to Defendant's Motion for Sanctions ("Sanctions Opp.") (Doc. 95), at 3–5. "In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (internal quotations omitted). Generally in this district, successful plaintiffs have recovered between $30,000 and $125,000 for garden variety emotional distress claims. *See Quinby v. WestLB AG*, No. 04 Civ. 7406 (WHP), 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008). Plaintiff has stated that he will only seek "'garden variety' emotion distress damages." *See* Sanctions Opp. at 5. Because Plaintiff seeks only "garden variety" emotional distress damages, the Court finds that Dr. Bennett's notes from a single, one-hour consultation with Plaintiff play only a "limited role" in this case.[10] Thus, the imposition of an adverse inference instruction is not merited with respect to the missing treatment notes.

### B. Additional Discovery Disputes and Grounds for Sanctions

As discussed above, with leave of the Court, Defendant raised several newly uncovered issues relating to Plaintiff's diligence in complying with discovery requests. Defendant points to Plaintiff's delay in producing materials after the Court's September 12, 2017 order, Plaintiff's misrepresentations to Defendant and to the Court about the date of Henry's consultation with Dr. Bennett, Plaintiff's misrepresentations to Defendant and to the Court about the number of mental health providers Henry consulted, and Plaintiff's failure to inform Defendant that Dr. Bennett had provisionally diagnosed Henry after their first visit. *See* Memorandum of Law in Further

---

[10] The Court further notes that, according to Dr. Bennett, despite that one consultation, Henry "never became a patient" of his. Auster Third Recons. Aff. ¶ 4.

Support of Defendant's Motion for Reconsideration ("Further Support Mem.") (Doc. 126) at 1; Doc. 134 (December 7, 2017 Conference Transcript) at 7:5–10:1. Defendant argues that these failures merit the imposition of sanctions under Rule 26, Rule 37(b), 28 U.S.C. 1927, and the Court's inherent authority. The Court will address the appropriate legal standards first.

### 1. Legal Standards

#### a) Rule 26

Rule 26(g)(2) provides that "every discovery request, response, or objection . . . shall be signed by at least one attorney of record," which imposes "an affirmative duty to engage in pretrial discovery responsibly and is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Metro. Opera*, 212 F.R.D. at 218–19 (internal quotations omitted). The certification requirement "obliges each attorney to stop and think about the legitimacy of the discovery request, a response therefore, or an objection." *Id.* (quoting Fed. R. Civ. P. 26(g) Advisory Committee Notes to 1983 Amendment). If an attorney's certification violates Rule 26(g) without substantial justification, the imposition of sanctions is mandatory, although the court has discretion in identifying the appropriate form of sanctions. *See Kiobel v. Royal Dutch Petroleum Co.*, 02 Civ. 7618 (KMW), 2009 WL 1810104, at *2 (S.D.N.Y. June 25, 2009).

Rule 26(g) does not require that an attorney certify the truthfulness of the client's factual responses. *Id.* However, "all attorneys conducting discovery owe the court a heightened duty of candor." *Kosher Sports, Inc v. Queens Ballpark Co., LLC*, No. 10 Civ. 2618 (JBW) (RLM), 2011 WL 3471508, at *7 (E.D.N.Y. Aug. 5, 2011).

#### b) 28 U.S.C. § 1927

Section 1927 governs the conduct of attorneys and provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the

court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. A moving party must show that the attorney acted in bad faith; that is, that her actions were "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Metro. Opera*, 212 F.R.D. at 220 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)).

### c)  **Inherent Power of the Court**

A court may also impose sanctions on a party or an attorney "under its inherent power to manage its own affairs." *Id.* (quoting *Residential Funding Corp.*, 306 F.2d at 106–07). Sanctions under the Court's inherent powers also require a finding of bad faith. *Id.*

### 2.  **Discussion**

Until Henry's second deposition on November 30, 2017, Plaintiff's counsel continued to attest that Henry only had one visit with a mental health provider, which was a visit to Dr. Bennett that took place on December 4, 2015. *See* Doc. 134 (December 7, 2017 Conference Transcript) at 3:13–21. Both parties are now aware that Henry consulted with two mental health providers—first, through an in-person consultation with Dr. Bennett on December 4, 2014, and second, through a telephone interview with a mental health provider in January 2015. *See id.* at 3:13–21; 7:5–9:2. Both parties are also now aware that Dr. Bennett noted a provisional diagnosis after his consultation with Henry. *Id.* at 9:16–18, 13:10–17; *see also* Auster Third Recons. Aff. ¶¶ 19, 22–23.

As discussed above, Plaintiff could have ascertained the correct information about Henry's efforts to receive mental health treatment, and shared it with Defendants, significantly earlier. First, had Auster asked Henry in October 2015, when the information was first

requested, when it was that he consulted with Dr. Bennett, Henry likely would have remembered more clearly that the year of his visit was 2014 and not 2015, and would certainly have known that it was not in December of 2015. Significant confusion would have thus been avoided. Second, when Dr. Bennett provided conflicting information about the year of treatment in his voice mail and e-mail messages, Auster could have called or written back to clarify the correct treatment date. Auster stated in her most recent affirmation that she did not realize until December 10, 2017 that she saved Dr. Bennett's voice mail message and thus was unaware of the discrepancy between the two dates. Auster Third Recons. Aff. ¶ 9. However, over a year prior, on November 17, 2016, Auster filed an affirmation with this Court in which she attested that Dr. Bennett indicated via voice mail that he saw Henry in December 2014 and that she kept a copy of the voice mail message.[11] Auster Aff. ¶ 2. Finally, when Henry reviewed Dr. Bennett's email and the messages he exchanged with Homan-Grey during his deposition, he immediately recognized that the date in Dr. Bennett's email was incorrect. *See* Henry Dep. at 331:16–332:7. At the very latest, Auster and Liederman should have consulted Henry about the date of his treatment after seeing a text referring to a new therapist when they first received the text messages from Henry that were produced on October 10, 2017. Instead, even after Defendant pointed out the inconsistency, Plaintiff's counsel continued to assert that there was a single mental health consultation and stated that they were "baffled" by Defendant's allegations. *See* Further Opp. Mem. at 2–3; Doc. 124 (October 25, 2017 Conference Transcript) at 7:2–8.

Although the Court finds no evidence suggesting that Plaintiff's counsel knowingly made misrepresentations to the Court and Defendant—and indeed their bafflement concerning the dates appears to be completely genuine—it is now apparent that the repeated and incorrect

---

[11] In that same affirmation, Auster also cites to Dr. Bennett's email and its mistaken reference that the consultation took place in 2015. Even at that point, Auster did not pick up on the discrepancy.

assertions about the date of treatment, the availability of information about a diagnosis, and the number of mental health providers Henry consulted were made "without any real reflection or concern for their obligations under the rules governing discovery and . . . without a reasonable basis." *See Metro. Opera*, 212 F.R.D. at 221–22. Indeed, as in *Metropolitan Opera*, when faced with evidence suggesting that they did not diligently comply with discovery obligations, Plaintiff "persisted in ignoring, indeed belittling" Defendant's inquiries. *Id.* at 223; *see* Further Opp. Mem. at 1–2 (maintaining that Henry "consulted one mental health provider on one occasion" and arguing that "it is Defendant, and not Plaintiff, who should be sanctioned by the Court."). Thus, the Court finds that it must impose mandatory sanctions under Rule 26(g). *See Metro. Opera*, 212 F.R.D. 178, 221–24 (awarding sanctions for misstatements about discovery compliance in written responses as well as in letters and statements made to Court). However, as discussed above, the Court does not find that Plaintiff acted in bad faith, and therefore sanctions under 28 U.S.C. § 1927 and the Court's inherent authority are not warranted.

Separately, Defendant argues that sanctions are justified under Rule 37(b) because Plaintiff "misse[d] the deadline" set forth in the Court's September 12, 2017 Order and failed to fully respond to the Defendant's Request for Admissions. Further Support Mem. at 6. At this stage of the litigation, more than a year after Defendant first filed its motion for sanctions seeking, *inter alia*, the production of an emotional distress journal and text messages, Plaintiff had an obligation to timely comply with the Court's discovery orders. To the extent that Auster and Liederman realized they could not do so, they were obligated to inform the Court and seek an extension, which they did not do. Instead, Auster filed a letter incorrectly relaying the date on which Plaintiff provided the relevant information to Defendant. *See* Plaintiff's Letter to the Court (Doc. 114) at 2. Auster only corrected this error during the Court's conference on the

issue. *See* Doc. 124 (October 25, 2017 Conference Transcript) at 6:5–7. Thus, the Court finds sanctions are appropriate for this failure to comply.

Defendant also argues that "the production of text messages and [Henry's] admission in the sworn statement that he did, in fact, text with his co-workers about work, after previously stating that no such messages exist, is a separate basis for sanctions under Fed. R. Civ. P. 37(c)." *See* Further Support Mem. at 6. With respect to the produced text messages between Henry and Homan-Grey, Plaintiff argues that "the fact that an additional responsive text was subsequently located and produced does not even begin to prove Defendant's bald assertion that Plaintiff's counsel never 'explain[ed] to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained.'" *See* Further Opp. Mem. at 5. In Henry's deposition, he stated that he searched his phone in 2015 for text messages in the same way that he searched in 2017, but happened to find the text messages with Homan-Grey only in 2017 when he spent a longer time looking. *See* Henry Dep. at 318:18–320:21. His second search was done to comply with the Court's September 12, 2017 Order, and he produced the relevant documents he found. Because Defendant has not put forward evidence that Plaintiff's counsel failed to explain discovery obligations, the Court denies Defendant's motion for sanctions with respect to the recently produced text messages.

Second, the Court does not see how Henry's recent sworn statements about his conversations with other servers via text demonstrate the need for sanctions. In a recent affidavit, Henry stated that he exchanged few text messages with other servers at Henry's Morgan, that they were usually centered around finding people to cover a shift, and that Henry "did not keep these text messages because [he] did not think these texts would be needed again

and [he] did not want to waste storage space keeping basic text messages about whether or not [he] could pick up a shift for someone." Cook Reply Aff. Ex. A ¶ 2. Defendant points to earlier filings in which Plaintiff denies that Henry ever exchanged text messages with his co-workers. *See* Further Support Mem. at 8–9. However, that filing, Plaintiff's opposition to Defendant's sanctions motion, states only that "Plaintiff did not produce any text messages . . . because, after [a] diligent search, Plaintiff found no such text messages outside of attorney-client privilege." *See* Sanctions Opp. at 10. If Henry deleted text messages from his co-servers because he did not think at the time that those text messages would ever be needed, then, when he searched his phone for the text messages in connection with this litigation, it would stand to reason that he would not find any. *See also* Henry Dep. at 316:22–25 (explaining that Henry contemporaneously deleted the text messages his co-workers sent). Defendant does not explain how this constitutes a failure to disclose that is neither substantially justified nor harmless, as required under Rule 37. Thus, the Court declines to grant sanctions based on Plaintiff's failure to produce text messages.

Finally, Defendant argues that Plaintiff's response to Defendant's Requests for Admission was "an exercise in futility" and that the Court should deem facts pertaining to Henry's obligations with the Upright Citizen's Brigade (UCB) admitted pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure. *See* Further Support Mem. at 7 n.2. Defendant does not explain how Plaintiff's response was deficient. Plaintiff argues that in his response, he admitted, denied, or objected to questions appropriately. *See* Further Opp. Mem. at 7. Plaintiff further states that he did not respond to questions relating to UCB because it is "a comedy theatre and training center completely unaffiliated with Defendant" and therefore is not connected to "work-related issues." *Id.*

In its September 12, 2017 Order, the Court ordered Plaintiff to respond or object to Defendant's Requests for Admission "with respect to the questions concerning the work-related issues, such as scheduling and arriving late, etc." *See* Doc. 103 (September 12, 2017 Conference Transcript) at 53:10–14. Defendant confirmed with the Court that discovery would only be reopened with respect to those issues. *Id.* at 54:3–6. When Plaintiff sent Defendant the responses, Plaintiff responded to questions about the UCB when the questions related to scheduling at Henry's Morgan. *See* Affirmation of Francis Cook in Further Support of Defendant's Motion for Reconsideration ("Cook Further Support Aff.") (Doc. 127) Ex. A at ¶¶ 27–28. Plaintiff did not respond to questions about the UCB that did not bear on Plaintiff's employment. *E.g., id.* at ¶ 33 ("The Upright Citizens Brigade made video recordings of your performances."). The Court finds that Plaintiff was not required to respond to these questions because they exceeded the limited scope of the re-opened discovery window. *See* Doc. 103 (September 12, 2017 Conference Transcript) at 53:10–14. Thus, the Court will not deem those matters admitted.

### C. Form of Sanctions

Although the Court must impose sanctions under Rule 26(g), the form of sanctions are left to its discretion. *See Kiobel*, 2009 WL 1810104, at *2. Sanctions may be levied against the attorney, the client, or both. Fed. R. Civ. P. 26(g)(3). Similarly, under Rule 37(c) and 37(b), the Court has wide discretion in determining the form sanctions should take. *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012).

Defendant argues that the Court should impose sanctions for Plaintiff's 26(g) failures in the form of dismissing the Complaint. *See* Further Support Mem. at 5–6. However, dismissal of a complaint is "'pungent, rarely used, and conclusive.'" *World Wide Polymers*, 694 F.3d at 160

(quoting *Dodson v. Runyon,* 86 F.3d 37, 39 (2d Cir. 1996)). It should therefore only be employed where a court is "sure of the impotence of lesser sanctions." *Id.* Furthermore, "when an attorney's misconduct or failing does not involve an attempt to place the other side at an unfair disadvantage, any sanction should ordinarily be directed against the attorney rather than the party . . . ." *Id.* Tellingly, the sole case Defendant cites in support of its argument that the Complaint should be dismissed involved a case under the Court's inherent powers, not Rule 26, because the sanctions in that case were based on the plaintiff's fraud on the court rather than the plaintiff's counsel's discovery failures. *See* Further Support Mem. at 5–6 (citing *McMunn v. Memorial Sloan-Kettering Cancer Ctr.,* 191 F. Supp. 2d 440 (S.D.N.Y. 2002)). Therefore, on balance, the Court finds that sanctions short of dismissal are the most appropriate resolution.

Considering the Plaintiff's failings with respect to: (1) the diligence with which counsel sought all available treatment records; (2) the statements Plaintiff's counsel continued to make regarding the number of mental health providers Henry consulted and the date of his consultation with Dr. Bennett; and (3) the timeliness of Henry's compliance with the Court's September 12, 2017 Order, the Court finds that a monetary award to Defendant, coupled with an order precluding Plaintiff from attempting to use Henry's mental health consultation in support of its claim for emotional distress, is appropriate. *See Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.,* 301 F.R.D. 47, 51–52 (S.D.N.Y. 2014) (granting sanctions in the form of preclusion of an expert declaration and a portion of the moving party's expenses); *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F. Supp. 2d 378, 423 (S.D.N.Y. 2010) (granting monetary sanctions of $10,000 against a "small corporation" and noting the appropriateness of considering the relative wealth of the parties when determining the amount of sanctions). In this case, the Court holds that a monetary fine of $1,000 against Plaintiff's counsel is appropriate.

**IV.     CONCLUSION**

Defendant's motion for reconsideration is GRANTED.  Defendant's motion for sanctions is GRANTED in part and DENIED in part.  It is hereby ORDERED that:

1.      Plaintiff is precluded from relying on the fact that Henry consulted mental health providers in support of its claim for emotional distress damages.

2.      Plaintiff's counsel will be responsible for paying a $1,000 award to Defendant within 14 days of the date of this Order.

The Clerk of Court is respectfully directed to terminate the motion (Doc. 107).

Dated:     January 22, 2018
           New York, New York

Edgardo Ramos, U.S.D.J.